

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

OCT - 9 2015

CLERK, U.S. DISTRICT COURT
By _____
        Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

JERRY WAYNE WILLIAMS, §
§
Petitioner, §
§
v. § No. 4:14-CV-131-A
§ (Consolidated with No.
WILLIAM STEPHENS, Director, § 4:14-CV-132-A)
Texas Department of Criminal §
Justice, Correctional §
Institutions Division, §
§
Respondent. §

## MEMORANDUM OPINION
### and
### ORDER

This is a petition for writ of habeas corpus pursuant to 28

U.S.C. § 2254 filed by petitioner, Jerry Wayne Williams, a state

prisoner incarcerated in the Correctional Institutions Division

of the Texas Department of Criminal Justice (TDCJ), against

William Stephens, Director of TDCJ, Respondent.  After having

considered the pleadings, state court records, and relief sought

by Petitioner, the court has concluded that the petition should

be denied.

### I.  Procedural History

In September 2007 petitioner was indicted in the Criminal

District Court Number One of Tarrant County, Texas, Case Nos.

1077028D and 1077018D, on multiple counts of aggravated sexual

assault of a child under the age of 14 and indecency with a child

by contact.  The complainants were his twin step-grandsons.

Admin. R., WR-80,613-01 at 315, ECF No. 15-29.  Petitioner's jury

trial commenced in September 2008.  The twins, who were 18 years

old at the time of trial, both testified that at the age of five

or six in 1995 or 1996 petitioner began touching their genitals

and having oral sex with them and having them touch his genitals

and perform oral sex on him for money, alcohol, cigarettes, and

other rewards.  Admin. R., RR, vol. 3, at 96, 105-06, 163-64,

204, 231-32, ECF No. 15-7.  Petitioner also showed them

pornographic movies.  *Id.* at 99-100.  The abuse typically

occurred at petitioner's house, although it did occur in a mobile

home on either petitioner's property near the Texas Speedway or

his shop in Bedford, ten to twelve times a month until the boys

were eleven or twelve in 2000 or 2001.  *Id.* at 97, 153-55, 204-

05.  At that point, the boys no longer wanted to participate and

began spending less time at petitioner's house or ignoring his

advances.  *Id.* at 206.  Although no further abuse took place

after 2000 or 2001, petitioner continued to give the boys gifts.

*Id.* at 108-09, 178, 183, 206.  At the guilt/innocence phase of

the trial, the state called the victims and the wife of one of

the victims to testify.  Petitioner did not testify or call

2

witnesses on his behalf.  The jury found petitioner guilty in each case of two counts of aggravated sexual assault of a child under 14 years of age and two counts of indecency with a child by contact.  At the punishment phase, the state called two witnesses, the victims' mother and C.E., one of petitioner's daughters, who testified that petitioner sexually assaulted her and her sister M.F. while they were small children.  RR, vol. 4, 104-05.  Petitioner called nine family members as character witnesses, including his wife, Diane Williams, and M.F. who confirmed petitioner's sexual abuse of her as a small child.  The jury assessed petitioner's punishment at 75 years' confinement and a $10,000 fine in each aggravated sexual assault case and 20 years' confinement and a $10,000 fine in each indecency case, the sentences to run concurrently.  Resp't's App. A, ECF No. 9.  The Second Court of Appeals of Texas affirmed the trial court's judgments, the Texas Court of Criminal Appeals refused petitioner's petition for discretionary review, and the United States Supreme Court denied writ of certiorari.  *Id*. Apps. C-E. Petitioner also filed two postconviction state habeas applications, which were denied by the Texas Court of Criminal Appeals on the findings of the trial court.  *Id*. App. F, G & I. These federal petitions for habeas relief followed.

## II.   Issues

In six grounds, Petitioner claims his trial counsel were

ineffective because they—

> (1) failed to investigate or present evidence
> concerning the fact that he suffers from hypospadias, a
> birth defect of the penis;
>
> (2) failed to investigate or present evidence
> concerning the fact that he suffered from erectile
> dysfunction during the time the complainants alleged
> they engaged in sexual activity with him;
>
> 3) failed to investigate or present evidence that he
> suffered a heart attack in 1996 and underwent
> angioplasty twice and later heart bypass surgery;
>
> (4) failed to investigate or present evidence
> concerning the fact that his house burned down in 1996
> and he was not living in the house for two years during
> the time period the complainants alleged they engaged
> in sexual activity with him in the house;
>
> (5) failed to investigate or present evidence that he
> had a job and was at work during the time the
> complainants testified he was at home engaging in
> sexual activity; and
>
> (6) failed to present evidence that the complainants
> invited him to their highschool graduation and wrote
> him thank you notes for graduation gifts after they
> allegedly told their families they were sexually abused
> by him.

Pet. 6-12(b), ECF No. 1.

## III.   Rule 5 Statement

Respondent believes that petitioner has sufficiently

exhausted his claims in state court and that the petition is

4

neither successive nor untimely. Resp't's Answer 6, ECF No. 17; 28 U.S.C. § 2244(b), (d).

## IV. Discussion

### Legal Standard for Granting Habeas Corpus Relief

Under 28 U.S.C. § 2254(d), a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless he shows that the prior adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court. 28 U.S.C. § 2254(d). A decision is contrary to clearly established federal law if the state court arrives at a conclusion opposite to that reached by the United States Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state court decision will be an unreasonable application of clearly established federal law if it correctly identifies the applicable rule but applies it unreasonably to the facts of the case.

5

*Williams*, 529 U.S. at 407-08.

The statute further requires that federal courts give great deference to a state court's factual findings. Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. The petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). When the Texas Court of Criminal Appeals denies a federal claim in a state habeas corpus application without written order, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Johnson v. Williams,* 133 S. Ct. 1088, 1094 (2013) (quoting *Harrington v. Richter,* 562 U.S. 86, 98-99 (2011)). With these principles in mind, the court addresses petitioner's claims.

### *Ineffective Assistance of Counsel*

A criminal defendant has a constitutional right to the effective assistance of counsel at trial. U.S. CONST. amend. VI, XIV; *Evitts v. Lucey*, 469 U.S. 387, 393-95 (1985); *Strickland v. Washington*, 466 U.S. 668, 688 (1984). An ineffective assistance claim is governed by the familiar standard set forth in *Strickland v. Washington.* 466 U.S. at 668. To establish

6

ineffective assistance of counsel a petitioner must show (1) that

counsel's performance fell below an objective standard of

reasonableness, and (2) that but for counsel's deficient

performance the result of the proceeding would have been

different.  *Id.* at 688.

    In applying this standard, a court must indulge a strong

presumption that counsel's conduct fell within the wide range of

reasonable professional assistance or sound trial strategy.  *Id.*

at 668, 688-89.  Judicial scrutiny of counsel's performance must

be highly deferential and every effort must be made to eliminate

the distorting effects of hindsight.  *Id.* at 689.  Where a

petitioner's ineffective assistance claims have been reviewed on

their merits and denied by the state courts, federal habeas

relief will be granted only if the state courts' decision was

contrary to or involved an unreasonable application of the

*Strickland* standard in light of the state court record.

*Harrington,* 131 S. Ct. at 785 (quoting *Williams v. Taylor,* 529

U.S. at 410); *Bell v. Cone,* 535 U.S. 685, 698-99 (2002).  Thus, a

federal court's review of state-court decisions regarding

ineffective assistance of counsel must be "doubly deferential" so

as to afford "both the state court and the defense attorney the

benefit of the doubt."  *Burt v. Titlow,* 571 134 S. Ct. 10, 13

(2013) (quoting *Cullen v. Pinholster,* 563 131 S. Ct. 1388, 1403 (2011)).

Petitioner was represented at trial by Jack Strickland and Harmony Schuerman.  Petitioner raised the claims presented herein in his state habeas application and, in support, produced medical records, the affidavit of Dr. James Galbraith, the affidavit of Diane Williams, petitioner's wife, copies of thank you notes to petitioner and his wife from the victims, insurance documents and photos regarding the house fire, and portions of the victims' testimony during their 2011 depositions in a civil case brought against petitioner for monetary damages, in which they both described petitioner's penis as small and circumcised but otherwise normal in appearance.  WR-80,613-01, 28, 30 & Exs. F-M at 67-224A, ECF Nos. 15-27 & 15-28.  The state habeas court conducted both a hearing by affidavit and a live hearing.

In his affidavit, attorney Strickland set forth his qualifications and construed petitioner's claims to allege that he was ineffective by (1) failing to investigate; (2) to present a defense; (3) to present evidence of petitioner's hypospadias and erectile dysfunction; (4) to present evidence of petitioner's 1995 heart attack and subsequent bypass surgery and recuperation; (5) to present testimony of petitioner's house fire and

8

subsequent period of "unlivability"; and (6) to present testimony

of petitioner's work during an unspecified time period.   Counsel

testified regarding these allegations as follows:

> Each of the foregoing claims shall be addressed in the
> order in which they are presented.

### RESPONSES

1.   This generic claim fails to state a cause of
     action.   It cites no specific complaints but
     simply offers up a conclusory allegation of "no
     investigation."   As such, it is impossible to
     specifically refute this "claim."

     In addition to its being generic and conclusory in
     nature, this claim is duplicative in that [it] is
     simply a restatement of claims number 3, 4, 5, and
     6.

     Notwithstanding the insufficiency of this claim,
     the allegation that I failed to investigate
     Applicant's case is wholly lacking in merit.   I
     spent many long hours conferring with Applicant,
     his wife, and his children.   I was fortunate to
     have the assistance of co-counsel, who although
     young and relatively inexperienced, is extremely
     bright, conscientious, and thorough.   I retained a
     licensed and very experienced investigator.   I
     engaged the services of a well-regarded polygraph
     operator.   I reviewed the entirety of the State's
     file and discussed it in detail with Applicant,
     his wife, members of his family, and the three
     experts retained by me.   I reviewed Applicant's
     medical records.   Among other duties, I ordered
     the investigator to visit and photograph
     Applicant's home.   I reviewed Applicant's very
     unsavory criminal history.   I retained a
     knowledgeable, experienced, and well-known
     clinical psychologist to evaluate Applicant,
     review his records, conduct psychological testing,

score that testing and confer with me.  The
results were disastrous and had that doctor
testified, Applicant's position would have been
even more compromised.  I researched and reviewed
the law applicable to the charges, expunctions,
pardons, impeachment, extraneous offenses,
depositions, and witness bias.  I negotiated at
great and often contentious lengths with the
prosecutor.  Not only did I prepare for trial, but
also for the three bond condition violation
hearings held in the months leading up to
Applicant's trial.

The overwhelming problem which arose in the course
of the investigation of this case stemmed not from
a lack of investigative effort, but the fact that
Applicant was unfailingly untruthful and deceptive
about his prior behavioral history, his medical
history and his conduct in regard to these
allegations.  The investigation turned up little
of benefit for Applicant.

2.   As is true of the foregoing claim number 1, this
generic, conclusory allegation fails to state a
cause of action.  It is impossible to specifically
refute the "claim" and it is merely a duplicative
restatement of claim numbers 3, 4, 5, and 6.

As noted in my conclusion to this affidavit,
Applicant agreed with my advice to rest his case
without calling witnesses.  That was based on the
extraneous matters which were potential topics for
cross-examination, the evidence known to us, but
undiscovered by the State, and what was believed
to be not very good presentations by the victims.
Thus claims number 1 and 2 lack any merit
whatsoever.

3.   Although Applicant's third claim is cumulative and
multi-faceted, I will nonetheless offer a single
response.

     a.   Hypospadias.  This is a fairly common medical

10

condition which is present in approximately
one in 250 males.  The severity of the
condition varies.  Applicant makes no claim
that his condition is severe, such as would
be true of a penoscrotal or perineal
hypospadias.  To the contrary, a November
2004 doctor's report which I received from
Applicant's physician prior to trial
indicates circumcised penis "... with a
little glandular hypospadias."  That is
indicative of urethral opening at the glans
(head) of the penis.  This is the sole
mention of this condition which is found in
Applicant's medical records.  In fact,
medical records obtained from other
physicians found that Applicant possessed
"... a normal penis and testicles ..."  If a
physician observed Applicant's penis to be
normal, it is logical that young boys would
have believed likewise.

Applicant's indictments alleged offenses in
January of 1999 and 2000.  At that time the
injured parties, twin brothers born in 1990,
were 9 years old.  While it certainly would
have been possible to cross-examine the two
boys on Applicant's insignificantly unusual
penis and the location of his urethral
opening, only an idiot would have done so.
Young children may not have a proper frame of
reference by which to compare a penis; they
may be traumatized that they become
frightened and confused; they may close or
avert their eyes when their "paw-paw" forces
his penis into their mouths; they may not
know the exact location from which a
perpetrator's ejaculate discharges from his
penis.  Any Monday morning quarterback lawyer
who believes it is a useful trial strategy to
belabor such details is either misinformed or
deficient.  There as no evidence from any
reliable medical source that Applicant's
condition was of such a severity as to

warrant this tactic and it seemed to be ill-advised at best.

b.   <u>Erectile Dysfunction.</u> Applicant claims that
     he suffered from erectile dysfunction.  The
     problem is that this alleged condition was
     apparently not consistent.  In 2004 he
     reported difficulty maintaining an erection.
     However, in 2000-the timeframe [sic] which
     was alleged in the instant indictments-
     Applicant's medical records reflect that
     while he had previously suffered from
     erectile dysfunction, he is "... now able to
     have good erections and maintain them through
     orgasm without any problem."

     Ejaculation, while it may have occurred from
     time-to-time in the course of his behavior
     with his grandchildren, was not the gravamen
     of the offenses for which Applicant was
     indicted, tried, convicted, and affirmed.
     Had Applicant's writ counsel bothered to
     review the indictments, he would have seen
     that penetration of the victims' mouths with
     Applicant's penis, penetration of Applicant's
     mouth with the victims' penises, and mutual
     touching of the genitals by all of the
     parties was what was alleged.  All of this
     behavior was possible irrespective of
     erections and/or ejaculations.  While I have
     little doubt that these two boys exaggerated
     their claims, little was to be gained by
     cross-examining them regarding their
     grandfather's erections.  Certainly skillful
     prosecutors-which my two adversaries
     were-could simply have pointed out that just
     because Applicant could not achieve an
     erection with his wife, that would not
     necessarily have prevented him from doing so
     when he engaged in his real
     interest-pedophilia.

On a final note, my willingness to go down this

12

road was dampened by an event that occurred during
out trial preparation.  Applicant informed me that
while his medical records revealed prescriptions
for Viagra, he had not taken those pills and in
their absence could not achieve an erection.  And
to prove the point, he claimed to still have the
full complement of pills, minus one solitary pill,
at home.  I instructed him to bring them to me and
we would consider using those pills, along with
his doctor's testimony, to make the point to the
jury.  However, when Applicant brought me the
pills, they did not appear to be Viagra.  After
comparing the pills with the PDR and even
researching whether they could be foreign
substitutes, we concluded that Applicant was
simply trying to hoodwink us.  When we confronted
Applicant with the discrepancy, he excused his
deception by claiming he must have been confused.
He appeared to be unconcerned with the damage such
a misstep would have caused.  Needless to say, I
became more cautious about what I accepted as fact
from Applicant.

4.   This claim complains that Applicant's medical
history of a heart attack, bypass surgery, and
recuperation was not presented to the jury.
Applicant offers no suggestion as to why such
evidence was relevant to the offenses as indicted
and by what means such evidence would have been
introduced.  Applicant was not available to
testify.  A 31 item notice of extraneous offenses
was provided to us by the State.  In addition to
numerous allegations of misconduct involving the
two victims in these cases, that notice cited
sexual offenses perpetrated on at least three
other children, three bond condition violations,
inappropriate sexual behavior with various
persons, and a poor reputation for truthfulness
and peacefulness.  Furthermore, during the course
of my pre-trial investigation, other acts of
misconduct became known to me beyond those known
to the State.  In my opinion, Applicant's wife
would have been a disaster as a witness inasmuch

13

as she was consistently non-responsive, argumentative, hostile, and demeaning of the victims.  In all likelihood, she would have succeeded only in opening doors to Applicant's unpleasant criminal history and his repeated bond condition violations while awaiting trial. Applicant's sons were likewise considered as witnesses and for sound reasons were not called to the stand.  Doctors could have been called as witnesses, but would thereby have been subject to cross-examination as to inconsistencies contained in Applicant's medical records.  This claim has no merit.

5.   This claim is critical of the fact that evidence of Applicant's 1996 house fire was not introduced. The basis for this allegation is puzzling.  One of the victims testified that he remembered the house fire and that during this time period, sexual acts had occurred at other locations, including a farm near the Texas Motor Speedway and in a motor home located at the damaged house.  As Applicant himself acknowledges in his application, the fire had occurred, the period of inhabitability had passed, the home had been repaired, and Applicant had moved back into his house prior to the time alleged in the indictments.  The claim is frivolous.

6.   This final claim complains that contrary to the victims' testimony, Applicant did work "during the time period and was not always home."

Applicant has failed to specify what time period he is talking about.  From the standpoint of a child victim however, it seems obvious that if a perpetrator lures that victim to his home, it would seem as if he is always there.  The point is so minor as to be of no consequence.

In addition however, this topic was discussed with Applicant prior to trial.  Applicant worked at a location a relatively short drive away from his

home.  Applicant was self-employed and generally
able to come and go as he saw fit.  His work
schedule apparently in no way prevented his access
to his grandchildren.  The claim is frivolous.

### CONCLUSION

These claims lack merit, both individually and
collectively.  A careful reading of the record of this
four day long trial reveals that it was a hard fought
case and emotions ran high.  Lengthy hearings were
conducted in regard to the admissibility of evidence.
Applicant was questioned [] on the record regarding his
rejection of the plea offer, his decision to invoke his
right against self-incrimination, and his agreement
with my advice to rest without calling witnesses.  At
no time did Applicant express any unhappiness with my
efforts.  Applicant even requested that I be appointed
to prosecute his appeal, which I did for a brief time.

Prior to and following his trial, Applicant and
his wife requested that I assist them in the moving of
assets, in anticipation of a civil suit against them.
I declined to do so and thereafter, alternate counsel
was retained.

Finally, I would like to state that my co-counsel,
Ms. Schuerman, worked at my direction and under my
control.  Although Ms. Schuerman proved to be helpful
in researching issues and conferring with witnesses,
she bears no responsibility for the decisions made in
behalf of Applicant and the legal strategy employed by
me.

Admin. R., WR-80,613-01 Writ vol 2 at 262-67, ECF No. 15-29.

Counsel Schuerman also responded by affidavit, wherein she

stated that she had limited involvement in the pretrial

investigation, that they were very concerned about calling

witnesses and opening the door to extraneous-offense-conduct

15

evidence, and that she had no "specific recall" of discussions
concerning petitioner's medical history of a heart attack, bypass
surgery, and recuperation, petitioner's house fire, or his
employment. *Id.* at 259-60.  She also stated-

> I have no specific recall of hypospadias having ever
> been raised as an issue by Mr. Williams.  I do,
> however, recall requesting that Mr. Williams bring in
> the bottle of Viagra.  Mr. Williams had claimed that
> despite the fact that he had been prescribed Viagra,
> only one pill was missing, and that since he could not
> obtain an erection without chemical enhancement, the
> full bottle of Viagra would prove that he could not
> have been guilty of the offense.  As weak as this
> argument was, it was further weakened by the fact that
> Mr. Williams brought in a bottle of pills that were not
> Viagra.  I specifically recall this because I was
> shocked and offended as a relatively inexperienced
> attorney that Mr. Williams would attempt to deceive his
> own attorney in such an easily detectible way.

*Id.* at 260.

In July 2013 a live evidentiary hearing was held.  During
the hearing, Dr. James Galbraith testified that he examined
petitioner on January 24, 2012, and determined that he suffers
from hypospadias, a congenital defect on the underside of his
penis where the "opening of the urethra, the end of the penis,
doesn't close."  Admin. R., WR-80,613-01, Writ Hr'g, RR, vol. 2,
at 11, ECF No. 15-25.  Dr. Galbraith testified that the defect is
about one centimeter in length from the tip of the penis to the
underside of the penis and one centimeter in width and is

16

"readily observable" but would not otherwise affect sexual performance. *Id*. at 11-12.

Diane Williams testified that she provided petitioner's medical records to trial counsel and a list of his medications; that she informed trial counsel of petitioner's hypospadias, his heart attack in August 1995 and resultant erectile dysfunction, the house fire in December 1996 requiring them to move out of their house for 20 months, and the fact that petitioner was working during the relevant time period; and that the complainants had sent graduation invitations to her and petitioner and thank you notes for graduation gifts. *Id*. at 20-28, 32, 35-37. She also testified that she had been ready and willing to testify at petitioner's trial regarding these matters. *Id*. at 20-28, 32.

Finally, petitioner introduced an affidavit by Dr. V. Gary Price, a urologist, explaining that his description of petitioner's penis as "normal" in an April 4, 2000 letter to referring physician Dr. Elizabeth Carter-

> was not intended to convey that Mr. Williams does not suffer from hypospadias. A person suffering from hypospadias could still be considered to have a "normal" penis from the standpoint of the type of examination I performed on Mr. Williams.

*Id*. RR, vol. 3, Applicant's Ex. 21. Dr. Price also stated that

17

he would have testified accordingly had he been asked or

subpoenaed to testify.  *Id.*

     Strickland and Schuerman also testified at the hearing.

Their testimony essentially mirrored their responses in their

affidavits, however Strickland further explained his strategy in

not questioning the victims about petitioner's hypospadias as

follows:

> [N]umber one, I had the doctors' reports.  Number two,
> Mr. Williams mentioned it once and once only, is my
> recollection.  Number three, my independent
> investigation indicated that it was not such an anomaly
> as to be likely to be a matter which could rise to some
> level of impeachment of these boys.  Number four, I did
> not know what their answers would be to the questions
> about this.  And it did not seem productive for me to
> dwell on the nature of his penis when I was defending
> this to this jury.

*Id.*, vol. 2, at 103-04.  Counsel also testified that he did not

attempt to impeach the victims with questions about petitioner's

job and business, petitioner's penile defect, the house fire or

the graduation invitations and thank you notes as a matter of

trial strategy because the issues were collateral and did not

seem crucial to petitioner's guilt or innocence or because by

doing so could have led to admission of additional inflammatory

evidence.  *Id.* at 129-32, 134, 184, 187-88, 199, 202.  Counsel

also stated that he did not question the victims about

petitioner's bypass surgery or his erectile dysfunction because they occurred, or possibly occurred, after the abuse ceased. *Id.* at 175, 181.

Based on the documentary evidence and the testimony elicited at the hearing, the state habeas court adopted the state's proposed findings of fact and conclusions of law, which are too numerous to list here, and, applying the *Strickland* standard, concluded that counsel adequately and independently investigated petitioner's case; that the decision to call witnesses or present evidence is trial strategy and a prerogative of counsel; that counsel made reasonable decisions regarding the development and presentation of their defense theory; that counsel's decisions not to present evidence of petitioner's hypospadias, erectile dysfunction, heart attack, surgery and recovery, house fire, work schedule and invitation and thank you notes was the result of reasonable professional judgment and sound trial strategy; and that petitioner had received effective assistance of counsel. *Id.* at 332, 334. The court further concluded that petitioner had failed to show that but for counsel's acts or omissions, the result of his trial would have been different. *Id.* at 333-34. The Texas Court of Criminal Appeals, in turn, denied relief based on the habeas court's findings.

Deferring to the state court's findings in the absence of clear and convincing evidence in rebuttal and having independently reviewed petitioner's claims in conjunction with the record, the state courts' application of *Strickland* was not unreasonable.  Petitioner's claims are conclusory, contradicted by the record,[1] or involve strategic and tactical decisions made by counsel, all of which generally do not entitle a state petitioner to federal habeas relief.  *See, e.g., Strickland,* 460 U.S. at 689 (holding strategic decisions by counsel are virtually unchallengeable and generally do not provide a basis for post-conviction relief on the grounds of ineffective assistance of counsel); *Green v. Johnson*, 160 F.3d 1029, 1042 (5th Cir. 1998) ("Mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue."); *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985) (ineffective assistance claims "based upon uncalled witnesses [are] not favored because the presentation of witness testimony is essentially strategy and thus within the

---

[1]For example, counsel did question the complainant(s) about the house fire, petitioner's heart attack and bypass surgery, and his job. Admin. R., RR, vol. 3, 138, 148-49, 152, 175.  Furthermore, the graduation invitations and thank you notes sent in June 2007 were addressed to both Diane Williams, the victims' grandmother, and petitioner and, although sent years after the abuse ceased, were sent before the victims reported the abuse.  *Id.* at 38; WR-80,613-01 Writ 88-94, Ex. K, ECF No. 15-27.

trial counsel's domain, and . . . speculations as to what these witnesses would have testified is too uncertain"). Moreover, a criminal defendant is not entitled to errorless counsel. *Boyd v. Estelle,* 661 F.2d 388, 389 (5th Cir. 1981). Rather, he must demonstrate that counsel's performance, in light of the entire proceeding, was so inadequate as to render his trial unfair. *Washington v. Watkins,* 655 F.2d 1346 (5th Cir.1981). This, petitioner has not accomplished. Rather, counsel's decisions largely appear to have been conscious and informed tactical ones reasonably based on his experience and the information counsel possessed at the time.

For the reasons discussed herein,

The court ORDERS the petition of petitioner for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 be, and is hereby, denied. For the reasons discussed herein, the court further ORDERS that a certificate of appealability be, and is hereby, denied.

SIGNED October ___9___, 2015.

JOHN MCBRYDE
UNITED STATES DISTRICT JUDGE

21